WOLF, J.
A student possessed a gun on school grounds. In light of the serious nature of the threat and the location in which it took place, the actions of school authorities *565 were reasonable. We, thus, uphold the trial court’s denial of the motion to suppress and affirm appellant’s conviction.
Five precepts guide our ruling in this case:
(1) allegations of possession of a gun on a school campus should be treated differently than similar allegations in other settings;
(2) students in school do not possess the same breadth of constitutional rights as parties in other settings;
(3) school resource officers should be treated as part of the school administrative team and not as outside police officers entering school grounds to conduct an investigation;
(4) courts should not second-guess the reasonable administrative decision of school officials to segregate a student from the general population prior to questioning a student about possible weapons possession; and
(5) courts should not question reasonable administrative policy decisions of school officials concerning the method of insuring safety in their security office.
In the underlying case, an anonymous tipster called the school on the day before the search and informed school officials that the student had carried a gun onto campus three months earlier. As a result, the school resource officer asked a school security guard to escort himself and the student to the security office, but did not tell the security guard why the student needed to be questioned. As a general policy, all students entering the security office were searched. When the student was asked to empty his pockets, he told the guard that he was carrying a lighter against school policy. When the student emptied his pockets, the security guard observed a gun on the student’s person. At all relevant times, the security guard was unaware of the resource officer’s reasons for calling the student to the security office.
Allegations of gun possession on school campuses are different from traditional Fourth Amendment cases. Many courts have recognized these cases are unique because of the seriousness of the threat, the location of the threat, the vulnerability and number of potential victims, and the lessened expectation of privacy of students.
In J.A.R. v. State, 689 So.2d 1242 (Fla. 2d DCA 1997), the court recognized the unique danger weapons pose in a school setting and the need for student safety. Appellant urges us to reject the J.A.R. approach based on the case of Florida v. J.L., 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), in which the United States Supreme Court rejected a “firearms” exception to the general rule that anonymous tips, without corroboration, are insufficient to justify a search, when the tips suggest the suspect is carrying a firearm. However, in so holding, the Court made a point of stating that:
The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk. Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports ... and schools, see New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), cannot conduct protective searches on the basis *566 of information insufficient to justify searches elsewhere.
J.L., 529 U.S. at 273-74 (emphasis added).
In T.L.O., the Supreme Court recognized that the special circumstances involved with conducting a search of a student on school property required that “the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.” 469 U.S. at 381,105 S.Ct. 733. The reason for this reduced standard is that “the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law.” Id. In order for a search to be reasonable, the action has to be justified from the beginning, and the search has to be reasonably related in scope to the reason for the search. Id. at 341-342, 105 S.Ct. 733. Further, a school search “will be permissible ... when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.” Id. at 342, 105 S.Ct. 733.
As the Supreme Court noted in T.L.O., the critical determination under the Fourth Amendment is whether the actions of the school officials were reasonable in light of all the circumstances. Appellant urges us to apply the probable-cause standard to this analysis because the search was conducted pursuant to an inquiry begun by the school resource officer. He then asks us to find the actions of the school officials were unreasonable. The law and common sense support neither of these determinations.
As noted in J.A.R. and T.L.O., the reasonable-suspicion standard is the appropriate standard to apply to the unique situation posed by the potential existence of firearms on school grounds. Every other District Court in the state has determined that the reasonable-suspicion standard is appropriate for searches of students on school grounds by school officials, including resource officers. See State v. J.H., 898 So.2d 240, 241 (Fla. 4th DCA 2005); K.K. v. State, 717 So.2d 629, 630 (Fla. 5th DCA 1998); State v. Whorley, 720 So.2d 282, 283 (Fla. 2d DCA 1998); State v. D.S., 685 So.2d 41, 43 (Fla. 3d DCA 1996).
The only possible support for applying the probable-cause standard to a search by a school resource officer is a 1981 case, M.J. v. State, 399 So.2d 996 (Fla. 1st DCA 1981). However, M.J. is distinguishable on the facts because the officer involved was an outside officer called to the school for the purposes of aiding in a search of a student. Id. Here, the relevant officer participation involved a school resource officer, rather than an outside police officer, and a different standard applies.
As noted by all of our sister courts, a search conducted by a resource officer placed in the school as a liaison is more akin to a search from a school official than from an outside police officer coming into the school to conduct a search, because a “school police officer is a school official who is employed by the district School Board.” D.S., 685 So.2d at 43; see also J.H., 898 So.2d at 241; K.K., 717 So.2d at 630; Whorley, 720 So.2d at 283; D.S., 685 So.2d at 43. Even more important here, “[i]t would be foolhardy and dangerous to hold that a teacher or school administrator, who often is untrained in firearms, can search a child reasonably suspected of carrying a gun ... at school only if the teacher or administrator does not involve the *567 school’s trained resource officer....” J.A.R., 689 So.2d at 1244.
In the underlying case, the student was approached following a tip that he carried a gun onto campus three months prior. While under other circumstances, this tip may have been considered stale, recent tragedies make it clear that school officials could not ignore the possibility that the student could possess a firearm on school property. These officials had not only the right, but the responsibility, to look further into the threat.
Additionally, the student was first approached in a crowded cafeteria. Investigating in this location would have placed the other students and staff in potential danger. Removing the student from this location, prior to questioning him, was the only responsible action that could have been taken.
During the walk to the security office, the student seemed anxious, and before the gun was found, the student admitted he was carrying a lighter, which was an infraction of school policy.
While the dissent asserts this court may not consider any of the student’s actions after he was “seized” for questioning at the school cafeteria, because the seizure itself amounted a Fourth Amendment violation, the request that the student come to the security office was not a seizure. Thus, any actions occurring during the walk to the security office and the questioning were properly considered.
Specifically, neither the United State Supreme Court nor any Florida court has ever held the request by a resource officer for a student to come to an administrative office for questioning amounted to a seizure for Fourth Amendment purposes. In fact, to hold so could have disastrous results. The underlying case is illustrative of this point. Should the officer have to question an armed student in a cafeteria full of children in order to avoid an unlawful seizure? Is a principal expected to determine if reasonable suspicion exists that a student committed a crime before calling a child into his office for questioning? As noted in T.L.O., schools present unique challenges, and the traditional confines of the Fourth Amendment do not necessarily carry over to this environment.
We should also not second-guess the school officials concerning the reasonableness of the administrative policy of searching students upon entry into the security office. The United States Supreme Court has held that suspicionless administrative searches of students are proper in certain circumstances. Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. 822, 829, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (approving of random drug urinalysis screening for school students participating in extra-curricular activities); Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (holding the same). “[A]dministrative searches differ from traditional criminal searches” because the “Fourth Amendment only applies where the object of the search is to penalize, which is not the case with an administrative search.” C.N.H. v. State, 927 So.2d 1, 3 (Fla. 5th DCA 2006) (citing Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)). “With an administrative search, the warrant and probable cause showing is replaced by the requirement to show a neutral plan for execution; a compelling governmental need; the absence of less restrictive alternatives; and reduced privacy rights.” Id. at 4.
Here, the record establishes the security guard testified that all students coming into the security office were checked “as *568 part of what we do, we have to check them.” Further, the resource officer noted that, when students come into the security office, “they automatically search, whether we’re there or not.” In addition, the only reasonable means of investigating the potential of a gun being carried on campus was to separate the student from the general population and take him to the administrative offices. Any other course of action would have subjected other students and staff to potential harm. Thus, there existed a neutral plan of execution. See, e.g., C.N.H., 927 So.2d at 3-4 (finding daily search of all students at a second chance school was a neutral execution of a search); see also State v. J.A., 679 So.2d 316, 319 (Fla. 3d DCA 1996) (finding random check of students with a metal detector was a neutral execution). Further, the compelling government need is obvious: the safety of the officers, the students, and the staff. See J.A., 679 So.2d at 319 (noting “[t]he incidences of violence in our schools have reached alarming proportions”); see also People v. Pruitt, 278 Ill. App.3d 194, 214 Ill.Dec. 974, 662 N.E.2d 540, 546 (1996) (stating that “[jjudges cannot ignore what everybody else knows: violence and the threat of violence are present in public schools”). Last, given the tip and the possibility that the student was carrying a gun, the means employed were the least restrictive means possible to maintain the safety of the officers, the students, and the staff. See J.A., 679 So.2d at 319 (noting the search of second chance students on a daily basis was the least restrictive means of maintaining a safe teaching environment given the history of the students involved).
We, therefore, affirm.
DAVIS, J., CONCURS; HAWKES, J., Dissents With Opinion.