The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
June 16, 2022

## 2022COA64

**No. 20CA0218, *People in Interest of J.G.* — Juvenile Court —
Delinquency; Constitutional Law — Fourth Amendment —
Searches and Seizures — Searches in School Settings**

A juvenile appeals the judgment adjudicating him delinquent

for possessing a handgun as a second-time juvenile offender and

possessing a weapon on school grounds. The juvenile contends

that the juvenile court erred by denying his motion to suppress the

gun because school officials discovered it in the course of an

unreasonable search of his backpack at school.

In this case, a division of the court of appeals applies the two-

part test established in *New Jersey v. T.L.O.*, 469 U.S. 325, 341

(1985), to novel facts. The *T.L.O.* Court laid out a two-part inquiry

for determining reasonableness. Under *T.L.O.*, a court must first

determine whether the search was justified at its inception, and

then determine whether the search was reasonably related in scope to the circumstances that initially justified the interference. *Id.* This case concerns the application of the first part of the inquiry.

Under ordinary circumstances, a search of a student at school is "justified at its inception" when a school official has reasonable suspicion that a search will turn up evidence that the student has violated or is violating either the law or the rules of the school. The division concludes that reasonable suspicion is a sufficient, but not necessary, means of justifying a search at its inception under *T.L.O.*

The division holds that a search may be justified at its inception without reasonable suspicion where the record shows that the student had a substantially diminished expectation of privacy in his or her person or property. Because the high school here implemented a safety plan for the juvenile that included a search requirement, the division concludes that J.G. didn't have a legitimate expectation of privacy in his backpack and that the search was justified at its inception even without reasonable suspicion of other wrongdoing. Accordingly, the division affirms.

COLORADO COURT OF APPEALS                                    **2022COA64**

---

Court of Appeals No. 20CA0218
City and County of Denver Juvenile Court No. 19JD641
Honorable Laurie A. Clark, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of J.G.,

Juvenile-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Fox and Johnson, JJ., concur

Announced June 16, 2022

---

Philip J. Weiser, Attorney General, Melissa D. Allen, Senior Assistant Attorney General, Denver, Colorado, for Petitioner-Appellee

Megan A. Ring, Colorado State Public Defender, Mark Evans, Deputy State Public Defender, Denver, Colorado, for Juvenile-Appellant

¶ 1    J.G., a juvenile, appeals the judgment adjudicating him delinquent based on findings that he possessed a handgun as a second-time juvenile offender, *see* § 18-12-108.5(1), C.R.S. 2021, and possessed a weapon on school grounds, *see* § 18-12-105.5, C.R.S. 2021.  He contends that the juvenile court erred by denying his motion to suppress the gun because school officials discovered it in the course of an unreasonable search of his backpack at school.

¶ 2    This case involves a novel application of an established legal test.  In *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985), the Supreme Court held that the legality of a search of a student in the school context depends "simply on the reasonableness, under all the circumstances, of the search."  The *T.L.O.* Court laid out a two-part inquiry for determining reasonableness.  *Id.*  First, a court must determine whether the search was justified at its inception. *Id.*  Second, a court must determine whether the search was reasonably related in scope to the circumstances that initially justified the interference.  *Id.*  This case concerns the application of the first part of the inquiry.

1

¶ 3     Under ordinary circumstances, a search of a student at school is "justified at its inception" when a school official has reasonable suspicion that a search will turn up evidence that the student has violated or is violating either the law or the rules of the school. *Id.* at 341-42. We conclude that reasonable suspicion is a sufficient, but not necessary, means of justifying a search at its inception.

¶ 4     A search may be justified at its inception without reasonable suspicion where the record shows that the student had a substantially diminished expectation of privacy in his or her person or property. Because the high school here implemented a Safety Plan for J.G. that included a search requirement, J.G. didn't have a legitimate expectation of privacy in his backpack sufficient to trigger a warrant requirement. And based on this, we conclude that the search was justified at its inception even without reasonable suspicion of other wrongdoing. Accordingly, we affirm.

## I.     Background

### A.     Overview

¶ 5     J.G. attended a public high school in Denver. In December 2018, the juvenile court adjudicated J.G. delinquent for two offenses: felony menacing and possession of a handgun by a

juvenile.  Based on this adjudication, on January 15, 2019, the school's Threat Appraisal Team completed a Preliminary Information Gathering Form (PIGF) and a Full Threat Appraisal (FTA).

¶ 6     The Threat Appraisal Team used the FTA to develop an Action and Intervention Plan, which we will refer to as J.G.'s "Safety Plan," as that is the nomenclature used before the juvenile court.  Officer Johnny Avila, the School Resource Officer, participated in creating the Safety Plan.  J.G.'s mother, J.G.'s guardian ad litem, the Dean of Students, and several other school officials also participated.

¶ 7     In February 2019, J.G. was involved in a motor vehicle theft. J.G.'s companion in that incident unlawfully possessed a firearm during the theft.  Following that incident, J.G. remained in detention until April 2019.  On April 22, 2019, to support J.G.'s transition back to school, the Threat Appraisal Team conducted another assessment and amended the Safety Plan.

¶ 8     School officials conducted the search at issue in this case pursuant to the Safety Plan.  The parties contest whether the Safety Plan justified the search.

B.     PIGF, Original Safety Plan, and Amended Safety Plan

¶ 9     The PIGF is the first part of Denver Public Schools' "Threat Response System."  The PIGF consists of six steps that help the Threat Appraisal Team complete the FTA, which, once completed, became J.G.'s Safety Plan.  Step one, titled "Make Sure All Students Are Safe," includes several boxes, only one of which the Threat Appraisal Team checked:

**Step 1: Make Sure All Students Are Safe**
☐  **Appropriately detain the student(s) being assessed until this protocol is completed.**
☒  Do not allow access to coats, backpacks, or lockers.
☐  Search was conducted.
☐  Weapon was found and turned over to Denver Police.
☐  If there is imminent danger, call DPS Department of Safety dispatch at 720-423-3911, and the Denver Police Department at 911.

¶ 10     In step six, titled "Determine next steps," the Threat Appraisal Team checked a box indicating that the incident warranted the completion of the FTA.

¶ 11     The FTA consists of eight steps.  Step seven of the FTA, titled "Develop an Action and Intervention Plan," contains a chart with generic fields on the left and corresponding information specific to J.G. on the right.

¶ 12     On April 22, 2019, after his release from detention following the motor vehicle theft incident, the Threat Appraisal Team amended J.G.'s Safety Plan.  All previous requirements remained in

4

effect, but the Threat Appraisal Team included additional requirements. As amended, the Safety Plan contained the following pertinent items excerpted from a larger chart:

**Step 7: Develop an Action and Intervention Plan**
Use the following Plan to address all concerns identified during this Threat Appraisal process.

| SCHOOL (attach additional pages as needed) | |
| --- | --- |
| ☐ Describe the level of supervision and who it will be conducted by: | Student will need to be searched everyday by admin and security. Student will need report to the CSO's office<br><br>Maintain prior level of supervision; student will stay on campus during lunch and will do another check-in with the main office to monitor his attendance following the lunch period. If student leaves or is unaccounted for, another search will clear. |
| . . . . | |
| ☐ Backpack, coat, and other belongings check-in and check-out by: | Student will not have a locker and would need to be searched daily.<br><br>Student will be able to leave materials in classes. Student is not anticipated to have homework. |

¶ 13 The juvenile court admitted the PIGF and the Safety Plan into evidence at the suppression hearing. Officer Avila also testified that the Safety Plan was intended to remain in effect for "the duration of [J.G.]'s stay at [the high school]." Officer Avila stated that the Safety Plan also prohibited "[J.G.] from being in possession of a book bag." The Safety Plan wasn't amended after the April 22, 2019, meeting.

## C. J.G.'s Return to School

¶ 14 J.G.'s mother tried to enroll J.G. in a different high school in the Denver Public Schools system for the 2019-2020 academic year.

5

That other school placed J.G. on a waitlist. A requirement of J.G.'s probation, however, was enrollment in high school. Thus, as the new academic year approached, J.G.'s mother hastily arranged for him to return to the same public high school he had attended the prior year.

¶ 15 On Wednesday, August 21, 2019, the week before the 2019-2020 academic year started, J.G.'s mother went to the school to arrange his re-enrollment. One of the school's counselors told J.G.'s mother that he could only start attending school once they had made a schedule for him. On the same day, J.G.'s mother also spoke to William Thompson, the Dean of Students at the high school. J.G.'s mother testified at the suppression hearing that Mr. Thompson told her that "he didn't think that [J.G.] would need a safety plan this year." Mr. Thompson, however, didn't testify at the suppression hearing.

¶ 16 On Monday, August 26, 2019, the first day of the new school year, Joe Naughton, a counselor at the high school, emailed J.G.'s mother confirming that J.G.'s schedule had been created and that he could return to school for the 2019-2020 academic year. J.G. returned to school the next day.

### D.    The Search

¶ 17    On the morning of August 29, 2019, J.G.'s third day back at school for the fall semester, Mr. Thompson attempted to call J.G.'s mother; but she was at work and didn't answer.  Mr. Thompson then left a message for her indicating that he would be speaking with J.G. and that he needed to go over a few things with both of them.

¶ 18    Later that day, Mr. Thompson and campus security officers notified Officer Avila that they needed his assistance with J.G. in the gym.  They informed Officer Avila that J.G. wasn't complying with a request to search his backpack.  Officer Avila testified that Mr. Thompson and campus security officers initiated the attempted search pursuant to the requirements of the Safety Plan, not because J.G. had acted in a manner causing reasonable suspicion to warrant the search.

¶ 19    Officer Avila responded, and he and the school officials walked J.G. to a hall where fewer observers were present.  Officer Avila and Mr. Thompson continued to tell J.G. that he needed to comply with the search, as he always had before.  J.G. then tried to sidestep all the officials and leave the building while holding the backpack.  By

this point, J.G. was acting aggressively. Officer Avila held J.G.'s arms and escorted him to the security office.

¶ 20    Officer Avila, Mr. Thompson, and the security officers placed J.G. in a private security room and told him that they were going to search him. J.G. responded that he would comply with a search of his person, but not to a search of his backpack. Officer Avila then restrained J.G. while one of the security officers removed J.G.'s backpack and completed the search.

¶ 21    The campus security officer opened the main compartment of J.G.'s backpack and found a fully loaded handgun. Officer Avila immediately arrested J.G., placed him in handcuffs, and completed a thorough search of his person. Later the same day, Mr. Thompson sent J.G.'s mother a suspension notice.

### E.    Suppression Hearing

¶ 22    At the suppression hearing, J.G. argued that the handgun should be suppressed because (1) he was seized and searched without reasonable suspicion; (2) the Safety Plan didn't constitute consent to a search; and (3) even if the Safety Plan could be interpreted as consent, it was no longer in place at the time of the search on August 29, 2019.

¶ 23    The juvenile court denied J.G.'s motion.  The matter proceeded directly to trial and the court adjudicated J.G. delinquent for (1) possessing a handgun as a second-time juvenile offender and (2) possessing a weapon on school grounds.  J.G. appeals the court's denial of his suppression motion.

## II.    Analysis

¶ 24    J.G. contends that the juvenile court erred by denying his motion to suppress.  We aren't persuaded.

### A.    Standard of Review and Legal Principles

¶ 25    The review of a suppression order presents us with a mixed question of law and fact.  *People v. Brown*, 2019 CO 63, ¶ 8.  We accept the juvenile court's findings of fact that are supported by competent evidence, but we review its application of the law to those facts de novo.  *Id.*  Likewise, the interpretation of written documents presents a question of law subject to de novo review.  *Collins v. Colo. Mountain Coll.*, 56 P.3d 1132, 1135 (Colo. App. 2002).

¶ 26    The Fourth Amendment prohibits unreasonable searches and seizures.  *People v. Bailey*, 2018 CO 84, ¶ 18.  This prohibition safeguards individuals' privacy and security against arbitrary

intrusion by government officials, *People v. Coke*, 2020 CO 28, ¶ 33, and it extends to searches of students by public school officials, *T.L.O.*, 469 U.S. at 333.

¶ 27    Ordinarily, a warrantless search must be supported by probable cause to believe that a violation of the law has occurred. *Id.* at 340.  This standard, however, is relaxed in the school setting to accommodate "the substantial need of teachers and administrators for freedom to maintain order in the schools."  *Id.* at 341.  Accordingly, the warrant requirement is not suited for the school environment and is generally not applicable to searches of school children.  *People in Interest of P.E.A.*, 754 P.2d 382, 387 (Colo. 1988).  We therefore evaluate the legality of school searches under the less stringent reasonableness standard established by the Supreme Court in *T.L.O.*, 469 U.S. at 341-42.

¶ 28    To determine reasonableness, the need to search must be balanced against the invasion that the search entails.  *P.E.A.*, 754 P.2d at 387.  Reasonableness must be assessed "under all the circumstances" of a search.  *T.L.O.*, 469 U.S. at 341.  This determination involves a two-part inquiry.  A school search is reasonable if it is (1) justified at its inception and (2) conducted in a

manner "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)); *P.E.A.*, 754 P.2d at 388.

### B.    Application

¶ 29    J.G. argues that the search that revealed the gun was illegal because school officials and Officer Avila didn't have reasonable suspicion to search his backpack. J.G. highlights that students have a legitimate expectation of privacy in the bags that they bring onto school grounds. *See T.L.O.*, 469 U.S. at 326. J.G. further asserts that he didn't do anything to provoke the search, as there were no reports that he'd engaged in suspicious behavior on August 29, 2019.

¶ 30    On appeal, J.G. makes several contentions related to the Safety Plan. First, J.G. argues that the Safety Plan didn't prohibit him from carrying a backpack on school grounds. Second, J.G. asserts that even if the Safety Plan included such a prohibition, it had expired after the 2018-2019 school year and wasn't in effect at the time of the search. More fundamentally, J.G. argues that the Safety Plan couldn't provide reasonable suspicion because it was only based on his history of prior offenses. Accordingly, J.G.

11

contends that the juvenile court erred in denying his suppression motion. We disagree.

¶ 31 At issue here is the first prong of the *T.L.O.* standard — namely, whether the search of the backpack, based on the Safety Plan, was justified at its inception. The *T.L.O.* Court explained that, "[u]nder *ordinary* circumstances," the search of a student's property is justified at its inception if there are "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." 469 U.S. at 341-42 (emphasis added); *see also People in Interest of C.C-S.*, 2021 COA 127, ¶ 19. Reasonable suspicion is a sufficient, but not necessary, justification of a search at its inception.

¶ 32 The ultimate inquiry rests on a determination of "reasonableness, under all the circumstances, of the search." *Id.* at 341. Therefore, whether J.G.'s Safety Plan was still in effect for the 2019-2020 school year is determinative. If the Plan was in effect, then J.G. had a substantially diminished expectation of privacy in a backpack that his Safety Plan prohibited, and that was nonetheless subject to search. For the following reasons, we conclude the Safety Plan was in effect and the search was reasonable.

### 1. The Safety Plan Subjected J.G. and His Backpack to Search

¶ 33    J.G. contends that the Safety Plan didn't prohibit him from bringing a backpack to school. J.G. maintains that the only mention of a backpack restriction is a single checked box in step one of the PIGF. J.G. highlights that the PIGF was only a short-term response to an emergent situation. J.G. argues that the Safety Plan was the only document with ongoing effect and it didn't include a backpack prohibition.

¶ 34    Rejecting J.G.'s contentions, the juvenile court found that the Safety Plan prohibited J.G. from bringing a backpack to school. We, however, conclude that the Safety Plan's search requirement is the controlling factor in this inquiry.

¶ 35    Under the Safety Plan, next to the box concerning "[b]ackpack, coat, and other belongings," there is individualized text relating to J.G. that reads: "Student will not have a locker and would need to be searched daily," and "[s]tudent will be able to leave materials in classes. Student is not anticipated to have homework." This same page of the Safety Plan also describes the level of supervision to which J.G. was to be subjected, and by whom the supervision would be conducted: "Student will need to be searched everyday by

13

admin and security. Student will need [to] report to the [Campus Security Officer's] office."

¶ 36 The following text was added to the Safety Plan on April 22, 2019: "Maintain prior level of supervision: student will stay on campus during lunch and will do another check-in with the main office to monitor his attendance following the lunch period. If student leaves or is unaccounted for, another search will clear."

¶ 37 We acknowledge that the PIGF isn't part of the Safety Plan. Nonetheless, even if we were to agree with J.G. that the explicit prohibition of the backpack in the PIGF wasn't intended to be permanent, this detail isn't dispositive. This fact must be placed in its proper context: a consideration of all the circumstances of the search as part of a reasonableness analysis. *See T.L.O.*, 469 U.S. at 341.

¶ 38 Importantly, the Safety Plan limited the items that J.G. could bring onto campus and carry between classes; the school ensured he could leave materials in classes and further limited his need to carry items between classes by not assigning him homework. The Safety Plan further prohibited J.G. from having a locker, thereby denying him access to areas where he could stow any property in a

manner or place that shielded it from school officials' view. These requirements were enforced through constant check-ins and routine searches.

¶ 39 Officer Avila — who was present when the Safety Plan was developed — testified that the Plan was "very strict" and included a backpack prohibition. Officer Avila further testified that J.G. had complied with the Safety Plan until the incident on August 29, 2019. We needn't, however, decide whether the Safety Plan prohibited J.G. from bringing a backpack to campus.

¶ 40 Rather, we conclude that regardless of whether the Safety Plan included a backpack prohibition, it unequivocally contained a search requirement. Further, the only reasonable interpretation of the Safety Plan is that the mandatory searches were intended to encompass J.G.'s person and anything he brought to campus, including a bag. Therefore, J.G. didn't have a legitimate expectation of privacy in his backpack.

2. The Safety Plan Was in Place for the 2019-2020 School Year

¶ 41 Next, J.G. argues that even if the Safety Plan prohibited him from bringing a bag and subjected him to being searched, it wasn't in effect at the time of the search. Thus, J.G. contends that

15

because he had done nothing else to provoke the search, it wasn't justified at its inception. We aren't persuaded.

### a. The Safety Plan Didn't Expire

¶ 42 First, J.G. asserts that there was no evidence that he had been told that he was subject to the Safety Plan during the 2019-2020 school year. Rather, J.G. contends that Mr. Thompson told his mother that a Safety Plan would likely not be necessary for the new school year. Moreover, J.G. emphasizes that the school never held a re-entry meeting to advise J.G. that he remained on a Safety Plan.

¶ 43 At the suppression hearing, Officer Avila testified that the Safety Plan was effective "for the duration of [J.G.'s] stay at [the high school]." Officer Avila testified that he was present for all of the meetings related to the creation and amendment of J.G.'s Safety Plan. Officer Avila reiterated that the Safety Plan was a "standing order," such that no new threat assessment was required for the 2019-2020 academic year. Officer Avila confirmed that the Safety Plan wasn't amended after the April 22, 2019, meeting.

¶ 44 Relatedly, J.G.'s mother testified that she had signed the Safety Plan and was aware of the procedures required to amend it.

She further testified that she hadn't attended any meetings to amend the Safety Plan.

¶ 45 Although J.G.'s mother also testified that Mr. Thompson had told her that "he didn't think that [J.G.] would need a Safety Plan for the [2019-2020] year," Mr. Thompson didn't testify at the suppression hearing. Therefore, the juvenile court considered J.G.'s mother's testimony of Mr. Thompson's purported remark as a hearsay statement for the limited purpose of what J.G.'s mother believed. The juvenile court noted that nothing in the record suggests that J.G.'s mother communicated this statement to J.G.

¶ 46 We note that the Safety Plan doesn't specify a timeframe and that it also doesn't include an expiration date. Thus, we construe the Safety Plan as remaining effective as long as J.G. attended the same high school. This is consistent with the indefinite nature of other documents, such as J.G.'s 504 Plan,[1] which were intended to remain in effect for the duration of J.G.'s time at the school.

---

[1] A "504 Plan" is a plan that provides a qualifying student with a disability accommodations that enable him or her to participate in the educational services and programs provided by the school. Such plans are implemented to ensure compliance with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794. *See People in*

### b. Discipline Incident Report

¶ 47    Second, J.G. asserts that the Discipline Incident Report, which Mr. Thompson drafted after the search, confirms that the Safety Plan was in effect for the 2018-2019 academic year, but not at the time of the search.  J.G. highlights that Mr. Thompson stated that J.G. "had been" on the Safety Plan "during the 18-19 school year," but it was only on the day of the search that "the decision was made that [J.G.] should remain on the safety plan."  We aren't persuaded.

¶ 48    It's true that considerable uncertainty surrounded J.G.'s return to school for the 2019-2020 academic year.  Mr. Naughton created the schedule that permitted J.G. to return to school and informed J.G.'s mother once it was completed.  J.G. returned to school on Tuesday, August 27, 2019.  The juvenile court acknowledged, however, that "[n]obody was really on notice." Indeed, the Discipline Incident Report shows that Mr. Thompson believed that J.G. had started school on Wednesday, August 28, 2019.  Further, the juvenile court emphasized an apparent lack of

---

*Interest of S.K.*, 2019 COA 36, ¶¶ 17-18 (discussing Section 504 of the Rehabilitation Act).

18

communication between Mr. Naughton and Mr. Thompson, commenting that Mr. Naughton may not even have known about the Safety Plan.

¶ 49    Before returning to school, J.G. was supposed to attend a re-entry meeting.  At this meeting, school officials would clarify that the Safety Plan was still in place.  It appears that due to the uncertainty surrounding J.G.'s start-date, no re-entry meeting was held.  Accordingly, the school officials' failure to hold a re-entry meeting isn't dispositive.

¶ 50    Moreover, we disagree with J.G.'s construction of the Discipline Incident Report.  Nothing in the document shows that the Safety Plan had expired.  It's true that J.G. "had been" on the Safety Plan for the 2018-2019 school year.  The Safety Plan, however, is, as discussed above, an ongoing document that could only be changed pursuant to certain procedures.  School officials never initiated the procedures required to amend or discontinue the Safety Plan.  Therefore, we don't ascribe significance to Mr. Thompson's use of the past tense in the Discipline Incident Report.

¶ 51    Further, we aren't persuaded that Mr. Thompson's statement that J.G. would "remain" on the Safety Plan indicates that the Plan

19

expired. On the contrary, a plain meaning interpretation supports the juvenile court's finding that the Safety Plan *continued* to apply to J.G. as it had previously. *See* Webster's Third New International Dictionary 1919 (2002) (defining "remain" as "to continue unchanged in form, condition, status, or quantity"). When school officials became aware that J.G. had returned for the 2019-2020 academic year, they decided it shouldn't be amended but that it would stay in place.

¶ 52 Thus, any failure to enforce J.G.'s Safety Plan during the first few days of the 2019-2020 academic year can't be reasonably construed as a lapse in the effectiveness of the Safety Plan itself. Likewise, any lack of enforcement due to oversight isn't dispositive in our consideration of the reasonableness of the search under all the circumstances.

¶ 53 In sum, J.G.'s history of firearm offenses properly informed the content and restrictiveness of the Safety Plan. We note that J.G. had complied with the Safety Plan for months and was aware of its requirements. Based on the foregoing, and the seriousness of the threat posed by gun possession on school grounds, we conclude that the juvenile court properly determined that compliance with

the Safety Plan was a condition of J.G.'s attendance at the same high school. Accordingly, we conclude that the Safety Plan was still in effect at the time of the search.

3. The Search Was Reasonable Under All the Circumstances

¶ 54 Finally, J.G. argues that the Safety Plan was insufficient to provide school officials with reasonable suspicion to justify the search at its inception. J.G. contends that school officials had no reason on August 29, 2019, to believe that he was violating any law or rule, or that he was acting in a manner justifying the search. Therefore, J.G. maintains that the only reason for the school officials' perceived need to search him was his history of prior offenses. J.G. insists that such a history can't provide reasonable suspicion for a search.

¶ 55 We disagree with J.G.'s contentions and hold that the school officials' search satisfied both prongs of the *T.L.O.* standard.

a. The Safety Plan Justified the Search at its Inception

¶ 56 J.G. relies on federal and Colorado authority arising from investigatory stop jurisprudence outside of the school context to contend that there was no reasonable suspicion to justify the search. *See United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996),

21

*cited with approval in Outlaw v. People*, 17 P.3d 150, 157-58 (Colo. 2001). J.G. relies on *Davis* for the proposition that knowledge of "a person's prior criminal involvement is not, standing alone, sufficient to create reasonable suspicion." *Id.* at 1469. *Davis*, however, isn't applicable.

¶ 57 In *Davis*, the Tenth Circuit Court of Appeals found that there were insufficient facts to provide an adequate articulable basis justifying an investigatory detention. *Id.* at 1470. Officers were patrolling an area with a history of criminal activity in a marked patrol car. At approximately 10 p.m., the officers saw a car with four individuals inside it parked in front of a building known to be associated with criminal activity.

¶ 58 As the officers arrived, one of the individuals in the car got out of the car, made eye contact with one of the officers, then broke eye contact and began walking toward the building with his hands in his pockets. The officers recognized the individual as a gang member, ex-convict, and seller of narcotics. The officers told the individual to stop and take his hands out of his pockets. When he continued walking, the officers seized him. The Tenth Circuit Court

22

of Appeals concluded that the officers' conduct wasn't based on "a reasonable suspicion that criminal activity was afoot." *Id.* at 1468.

¶ 59 Unlike the search in *Davis*, the school officials' search of J.G. occurred in the school context. Fourth Amendment rights are different in public schools than elsewhere; the reasonableness inquiry can't disregard the custodial and tutelary nature of public-school officials' power over schoolchildren. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655-56 (1995). Thus, the school environment permits "a degree of supervision and control that could not be exercised over free adults." *Id.* at 655. Accordingly, we necessarily review the facts at issue here differently than the court reviewed those in *Davis*.

¶ 60 This case is distinguishable from *Davis* by the fact that this case concerns gun possession at school. "Allegations of gun possession on school campuses are different from traditional Fourth Amendment cases." *M.D. v. State*, 65 So. 3d 563, 565 (Fla. Dist. Ct. App. 2011). It's widely accepted that these cases are "unique because of the seriousness of the threat, the location of the threat, the vulnerability and number of potential victims, and the *lessened expectation of privacy* of students." *Id.* (emphasis added).

23

¶ 61    Here, the Safety Plan was developed as part of the Denver Public Schools' "Threat Response System."  Officer Avila testified at the suppression hearing that the Safety Plan was devised for J.G.'s safety, and for the safety of all others at the school.  The Threat Appraisal Team developed the Safety Plan based on a specific, articulable, and objective basis — namely, J.G.'s adjudication of a firearm offense.  *Cf. id.* at 567 (The court held that an anonymous tip of a student bringing a gun to school three months earlier provided school officials with reasonable suspicion to conduct a search; "[R]ecent tragedies make it clear that school officials could not ignore the possibility that the student could possess a firearm on school property.  These officials had not only the right, but the responsibility, to look further into the threat.").  Thus, the Safety Plan represented a legitimate school rule implemented to reduce the serious threat posed by J.G. concerning gun possession at his high school.

¶ 62    We've concluded that the Safety Plan included a search requirement.  We've also concluded that the Safety Plan was in effect at the time of the search.  Therefore, we now determine that

J.G. didn't have a legitimate expectation of privacy in his backpack while at school.

¶ 63    Based on the Safety Plan's explicit search requirement, J.G.'s case doesn't involve the "ordinary circumstances" at play in *T.L.O.*, 469 U.S. at 341-42. Accordingly, we base our conclusion not on a reasonable suspicion inquiry, but rather on the fact that the Safety Plan stripped J.G. of a legitimate expectation of privacy in his backpack.

¶ 64    Students' expectation of privacy is balanced against the "substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds," and the school's "legitimate need to maintain an environment in which learning can take place." *P.E.A.*, 754 P.2d at 387 (quoting *T.L.O.*, 469 U.S. at 339-40). Students in the school environment thus have a lesser expectation of privacy. *Trinidad Sch. Dist. No. 1 v. Lopez*, 963 P.2d 1095, 1106 (Colo. 1998).

¶ 65    J.G.'s Safety Plan isn't a "trivial school regulation or precatory guideline for student behavior." *T.L.O.*, 469 U.S. at 377 (Stevens, J., concurring in part and dissenting in part). Rather, the Safety Plan relates to one of the most acute concerns in schools today:

possession of a dangerous weapon.  Indeed, "[v]iolent, unlawful, or seriously disruptive conduct," such as gun possession on school grounds, "is fundamentally inconsistent with the principal function of teaching institutions . . . .  When such conduct occurs amidst a sizable group of impressionable young people, it creates an explosive atmosphere that requires a prompt and effective response."  *Id.* at 376.

¶ 66     By bringing a backpack to school and refusing to submit to the routine searches contemplated by his Safety Plan, J.G. violated school rules.  Given the protective purpose of J.G.'s active Safety Plan, the warrantless search of his backpack was justified at its inception.

¶ 67     Therefore, based on a consideration of all the circumstances, school officials' search of J.G. was justified at its inception.

          b.     The Search Was Permissible in its Scope

¶ 68     Likewise, the search was permissible in its scope, satisfying the second prong of the *T.L.O.* test.  As part of this inquiry, the court must determine whether the search, as conducted, "was reasonably related in scope to the circumstances which justified the interference in the first place."  *Id.* at 341 (majority opinion) (quoting

26

*Terry*, 392 U.S. at 20). A search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

¶ 69 Here, school officials attempted to conduct a routine and mandatory search of J.G. pursuant to the Safety Plan. J.G.'s refusal to submit to the search in the gym area justified Officer Avila in escorting J.G. to the security office. Likewise, once in the security office, Officer Avila's restraint of J.G. was reasonably related to enabling a search of the backpack as J.G., according to the Discipline Incident Report, became belligerent while continuing to refuse to submit to the search. Further, the ultimate search, which consisted of a campus security officer removing and opening J.G.'s bag, wasn't excessively intrusive.

¶ 70 In sum, the search conducted by school officials on J.G. was reasonable under all the circumstances and therefore legal. Further, J.G.'s arguments regarding consent aren't relevant to the facts of this case. We decline to address them. Finally, because we conclude that the search was legal, the exclusionary rule doesn't apply.

### III.    Conclusion

¶ 71    For the reasons set forth above, we affirm the juvenile court's judgment.

JUDGE FOX and JUDGE JOHNSON concur.